The Honorable John C. Coughenour

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR15-336 JCC |
| Plaintiff, | |
| vs. | DEFENDANT'S SENTENCING MEMORANDUM |
| PAUL G. HURLEY, | |
| Defendant. | |

The defendant Paul G. Hurley ("Paul"), by and through his undersigned attorneys, submits to the Court the following Sentencing Memorandum to consider in imposing a fair and appropriate sentence. On February 12, 2016, an eleven-member jury found Paul guilty of Receiving an Illegal Gratuity by a Public Official, in violation of 18 U.S.C. § 201(c)(1)(B). The jury also returned guilty verdicts on Counts 2 and 3: Receiving a Bribe as a Public Official, in violation of 18 U.S.C. § 201(b)(2). He was found *not guilty* of Soliciting and Agreeing to Receive a Bribe by a Public Official, also charged under 18 U.S.C. § 201(b)(2). Paul's convictions carry no mandatory minimum sentence. Sentencing is set for May 13, 2016 at 10:00 am.

For the following reasons, Mr. Hurley respectfully requests the Court sentence him to one year and one day of imprisonment, followed by one-year supervision.

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

# I.     FACTUAL AND PROCEDURAL BACKGROUND

This Court presided over the jury trial and is familiar with the relevant facts and procedural background. To briefly summarize, Paul is a former revenue agent for the Internal Revenue Service (IRS).   As a revenue agent he audited tax records to determine whether taxpayers had accurately reported and paid their IRS tax liabilities. He began working for the IRS in 2009 and voluntarily resigned in September of 2015 because of these allegations. Paul is also an accountant, a currently suspended member of the Washington State Bar, and has a Masters of Law degree (LLM) in Taxation from the University of Washington School of Law.

In July of 2015, Paul audited "Have a Heart, Inc." a marijuana business in Washington State, co-owned by Ryan Kunkel. Paul was tasked to assess Have a Heart's 2013 tax filings and expanded the audit to examine tax returns for 2014. Mr. Kunkel had very few invoices or business documentation from 2013. Thus, Paul used a "ratio analysis" to assess tax liabilities for 2013. The IRS considers this method an acceptable accounting practice. Paul had no prior experience with the ratio analysis or auditing an illegal business. Nevertheless, Paul followed instructions and used invoices Mr. Kunkel had provided for 2014 to substantiate 2013, taking the ratios of gross sales and comparing them to the cost of goods sold as a percentage. Paul discussed his progress and auditing methods with his supervisor who expressed no concern.

During the closing conference held September 11, 2015, Paul presented Mr. Kunkel with the final audit paperwork (Form 4549) and explained the adjustments. The final tax audit actually *increased* Have a Heart's tax liabilities by **$282,624.00:** $115,633 for 2013 and $166,991 for 2014. Mr. Kunkel and Paul signed the agreement, which Paul then submitted to his supervisor on September 15, 2015. Paul also supplied Mr. Kunkel with a second, signed original report for his records. Paul undertook no further action on this audit and made no adjustments or edits to his final report.

At trial, the Government presented evidence that during the September 11, 2015 meeting Paul had asked Mr. Kunkel a question "off the record." Mr. Kunkel testified that Paul complained about his financial situation and expressed dissatisfaction with his job at the IRS. Specifically, Paul testified that he told Mr. Kunkel he was heavily burdened by student loans, living paycheck

DEFENDANT'S SENTENCING
MEMORANDUM - 2

to paycheck, and puffed that he could save Mr. Kunkel's business a million dollars. Notably, Mr. Kunkel also admitted during trial that he and Paul had actually discussed creating a job for Paul given his exceptional tax expertise. At some point while the two men were outside *Mr. Kunkel* rubbed his fingers together, gesturing a money sign. Mr. Kunkel testified to this fact. With respect to Paul's impression of the gesture, Paul testified, "Well, I was letting him know that I did a little bit of work for him. He had several other unrelated businesses, so I was giving him advice about general business structures and different ways to allocate expenses for those that are involved in the growing – production of marijuana. This exam didn't have anything to do with grows or the production of [marijuana]. And so outside, I was hinting to him that – and I told him, 'Yeah, I'm living paycheck to paycheck, and I could use a little help with my student loan.'" *Trial Tr. of Paul Hurley*, 36: 1-25 (February 9, 2016). Mr. Hurley further testified that the two men were discussing Mr. Hurley's student loan payments when Mr. Kunkel said, "Well, how about $20,000." *Id*. at 36: 25. The Government argued this was bribe.

On the morning of September 15, 2015, Mr. Kunkel met with his attorneys who then contacted the U.S. Attorney's Office. Curiously, that afternoon Mr. Kunkel and his attorneys met with an assistant U.S. Attorney and special agents from the FBI and TIGTA. During the meeting Mr. Kunkel's attorney authorized FBI agents to contact Mr. Kunkel for "operational planning purposes." Mr. Kunkel reportedly asked for a cooperation letter for his assistance; SA Reynolds advised Mr. Kunkel he could not make any such promises or guarantees. The following morning, September 16, 2015, FBI arranged to conduct surveillance of a meeting between Mr. Kunkel and Paul. During this meeting, Paul made specific reference to the job Mr. Kunkel had previously offered Paul. Mr. Kunkel subsequently gave Paul an envelope that contained $5,000 in pre-marked bills and arranged to meet Paul the following Monday at the same location to transfer an additional $15,000. On September 21, 2015, Paul and Mr. Kunkel met again under FBI surveillance. There, Mr. Kunkel gave Paul an envelope containing $15,000 in pre-marked bills.  Following the meeting, FBI agents arrested Mr. Hurley without incident.

The Government's theory of this case was that Paul had solicited a bribe in the amount of $20,000 in exchange for saving Have a Heart nearly one million dollars in tax liabilities through the audit process. Significantly, however, the IRS never conducted a second audit of

DEFENDANT'S SENTENCING
MEMORANDUM - 3

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

Have a Heart to review Paul's assessment. Moreover, TIGTA Special Agent Julie Anderson interviewed Paul's supervisor Sarah De Anda, along with Sarah's supervisor, who both reported and agreed "the IRS cannot give any kind of estimate on what Mr. Kunkel should have legitimately owed on his IRS audit." As such, there was no evidence presented at trial or specific jury finding that Paul's audit actually saved Mr. Kunkel's business $1,000,000. Again, Mr. Hurley's audit increased Have a Heart's tax liabilities by **$282,624.00.**

## II.     ADVISORY SENTENCING GUIDELINES

Paul disputes the sentencing guidelines proposed by U.S. Probation. Accordingly, Paul submits the following guideline calculations, which he believes are more in line with the facts and legal issues presented at trial and the jury's ultimate verdict.

> *Base Offense Level*:  11 pursuant to USSG §2C1.2
>
> *Specific Offense Characteristics*: + 4 pursuant to USSG §2B1.1(b)
>
> *Total Offense Level*:  15

Paul enjoys no criminal history whatsoever and falls within Criminal History Category I. Paul asserts the lesser offense of receiving a gratuity in violation of 18 U.S.C. § 201(c)(1)(B) applies to counts 2 and 3 because these counts relate to the same criminal conduct and were charged under the same statute as count 1. As such, this case should be viewed as Section 201(c)(1)(B) gratuity convictions, resulting in a base offense level of 11. See USSG §2C1.2. This base offense level of 11, with the 4-point enhancement under USSG §2B1.1(b), results in an advisory sentencing range of 18-24 months. This range will be lower should the court give Paul some reduction for accepting responsibility, as discussed below.

### 1.  Mr. Hurley Objects to Proposed Enhancement Under USSG §2B1.1(b)

Paul renews his objection to the PSR, which provides for a 14-point enhancement pursuant to §2B1.1(b). This enhancement is based on the theory that Paul's audit represented loss to the government of approximately $1,000,000. This notion carries insufficient factual support.  To be sure, the IRS never modified or discredited Paul's audit in any way. Moreover,

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

the IRS never re-audited Have a Heart to assess whether Paul's adjustments were improper. Special Agent Julie Anderson (TGITA) interviewed two of Paul's supervisors who both concluded the IRS could not tell one way or another what Mr. Kunkel legitimately owed on his IRS audit. Therefore, given that the measure of loss cannot reasonably be determined, this court must use the gain that resulted from the offense, which is $20,000. See, Note 3(B) to USSG §2B1.1.

## 2.   Mr. Hurley Objects to Proposed Enhancement Under USSG §2C1.1(b)(3)

Paul also disputes that as an IRS revenue agent he was a "public official in a high-level decision making or sensitive position" for purposes of a 4-point enhancement under USSG §2C1.1(b)(3). The basis for this objection is twofold. First, Paul's base offense level already incorporates his position as a public official, providing for an additional 2-point enhancement. See USSG §2C1.2(a). Second, Paul's position alone does not subject him to an additional enhancement under USSG §2C1.1(b)(3) as his discretion and job duties were curtailed by rather strict supervisory limitations. In fact, as presented at trial, Paul had several supervisors overseeing nearly every microscopic detail of his daily work life, including whether he received prior authorization to leave his desk during work hours. His position alone as an IRS revenue agent does not represent the typical hallmark of a high-level decision-making or sensitive position. Likewise, Paul's educational background and advanced law degree in taxation did not place him in a sensitive position with the IRS. Moreover, Paul was not working as an attorney during any portion of this offense as he was an an inactive member of the Washington State Bar at that time.

## 3.   Mr. Hurley Objects to Proposed Enhancement Under USSG §3C1.1

Paul submits that the proposed enhancement for Obstruction of Justice pursuant to USSG §3C1.1 is entirely inappropriate. The Government's basis for this enhancement is that Paul allegedly perjured himself on the witness stand by making statements inconsistent with the jury's verdict on counts 2 and 3. The testimony the Government cites to support this argument is underwhelming and insufficient. At worst, any alleged inaccurate statement Paul made while

DEFENDANT'S SENTENCING
MEMORANDUM - 5

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

testifying was the result of confusion, mistake or faulty memory. None of Paul's testimony rises to the level of a *willful attempt to obstruct justice*. See Application Note to §3C1.1 – Limitations on Applicability of Adjustment. Accordingly, the USSG §3C1.1 enhancement should not apply.

### 4.   Mr. Hurley Should Receive Some Credit for Acceptance of Responsibility

Finally, Paul believes that, despite putting the Government to its burden at trial, he nevertheless is entitled to some reduction in his offense level for acceptance of responsibility. The Commentary and Application Notes to USSG §3E1.1 provides, in relevant part: "[C]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction [for acceptance of responsibility]. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial… however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." Application Note 2 to §3E1.1. To prevail on this point, the defendant must "clearly demonstrate" that he was entitled to the reduction by a preponderance of the evidence. *United States v. Muhammad,* 120 F.3d 688, 701 (7th Cir.1997) (citing U.S.S.G. § 3E1.1(a)). Here, Paul expressed extreme remorse from the onset on this investigation. And, although he denied Mr. Kunkel's payment influenced his audit, Paul always accepted his guilt for accepting a gratuity. In fact, three days after his arrest Paul wrote a very sincere and heartfelt letter to his supervisor, Sara De Anda, resigning from the IRS. Therein Paul acknowledges the dissatisfaction and disgust he had of himself and expresses "immeasurable regret, and unfathomable remorse." A copy of Paul's resignation letter is attached hereto as ***Exhibit A***. These actions are consistent with a man who acknowledges his brief, but serious lapse in judgment and accepts responsibility for his conduct: in this case, disgracing the IRS by accepting an illegal gratuity. According, Paul respectfully asks the Court consider his pretrial conduct and "unfathomable remorse" consistent with accepting responsibility in this matter.

//

//

DEFENDANT'S SENTENCING
MEMORANDUM - 6

### III.    DEFENDANT'S SENTENCING RECOMMENDATION

The defense recommends a sentence of one year and one day of imprisonment, followed by one year supervision. This recommendation is sufficient but not greater than necessary to achieve the goals and stated purposes of sentencing under 18 U.S.C. § 3553(a). Paul is a first time offender, a father to young child, has ample support from family and friends, and enjoys meaningful ties to our community; Paul's conduct and the factors under Section 3553(a) support a sentence of one year and one day of imprisonment.

### 1.    The History and Characteristics of the Defendant

#### a.    Paul Hurley's Childhood

Paul Hurley was born in 1972 in San Jose, California to George and Sharon Hurley. George and Sharon are still married and live in the same home where Paul spent his childhood. Paul's father was a strict disciplinarian who worked his entire life in "blue collar" jobs, including a linen distributor, beer truck driver, and an elementary school janitor. Paul's father is an alcoholic and spent more time at work and in a bar then he did at home with the family. Paul's mother worked part time as an elementary school aide and primarily raised Paul and his older sister. Paul's older sister continues to struggle with substance abuse and depression and lives at home with her parents. Paul describes his childhood as fairly normal with a modest serving of dysfunction. He enjoyed school, excelled in soccer and had friends.

#### b.    Paul's Education and Work History

Paul has undoubtedly worked incredibly hard his entire life; it's unclear whether he is a zealous overachiever or has an irrational fear of failure. After high school, Paul attended San Jose State University where he studied a variety of subjects and competed on the school's soccer team. During and after college, Paul delivered pizzas and worked various jobs until he decided to pursue a legal education. Paul moved up the peninsula to San Francisco, attended Golden Gate University School of Law, and graduated in 2005. He was also diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) while in law school. Immediately after graduation, Paul moved to Seattle where he earned his Masters of Law degree (LLM) in taxation from the University of

DEFENDANT'S SENTENCING
MEMORANDUM - 7

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

Washington School of Law in 2006. After earning his LLM, Paul pursued additional studies in accounting. While Paul pursued his dreams earning various professional degrees, he also collected debt – lots of debt.  To this day, Paul has outstanding student loans in the ballpark of $250,000. He views this figure as insurmountable. His first professional job was with the IRS where his starting annual salary was roughly $50,000; he earned modest raises and eventually made $72,000 in his last full year of employment.

        c.   <u>Paul's Family</u>

Paul is not married but has known Misty for 20 years and romantically for 4 years. The couple has a very active and adorable two-year-old son named Fletcher. Misty is a phenomenal mother and works long hours most nights serving tables at a local restaurant. Not surprisingly, family is an extremely sensitive and difficult topic for Paul as he genuinely feels he destroyed his family beyond any hope of repair. Paul is not certain whether Misty will stick around until he is released from prison but fears she will not. Nevertheless, Paul made arrangements for his parents to help Misty and Fletcher financially. The impact this case has had on Paul's family could be no more extreme or devastating.

As detailed in the roughly **50 letters** submitted on Paul's behalf, attached hereto as ***Exhibit B***, Paul has overwhelming support from friends, family and acquaintances who are in shock and utter disbelief of Paul's conduct and resulting convictions. They describe Paul's case as completely out of character, highlighting the fact Paul never had legal troubles in the past. The general tone of these letters portray Paul as man unquestionably devoted to his family who made a rather unfortunate and costly mistake. These letters describe Paul as hard working, respectful, caring, compassionate, loving, and someone who has truly embraced fatherhood. Defense counsel echoes these terms as representative of Paul's true character.

        d.   <u>Paul Has No Criminal History</u>

Paul is a first-time offender with no criminal history whatsoever. Under the Section 3553(a) analysis, Courts generally recognize that prison has greater significance for those imprisoned for the first time. *See*, e.g., *US v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

downward variance justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with the goals of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in § 3553(a)(2)(B)); *US v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of two months in jail and four months home confinement, where advisory range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from reoffending); *U.S. v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration); *see also U.S. v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute heroin, despite a guideline range of 46-57 months, based on his lack of criminal record, long work career, community support, and responsibilities as a single father, which reduced the likelihood he would reoffend).

### 2.  Nature and Circumstances of the Offense

This case garnered national media attention because Paul worked for the IRS and the federal government accused him of soliciting a bribe from a shady taxpayer who operated an illegal marijuana business. The case was interesting because from an outside perspective it touched upon politics, economics, and important social issues such as public trust, corruption, the student loan epidemic, unlawful-business taxation, and conflicts between federal and state marijuana laws. However, Paul is not the poster child for these issues. Paul admittedly disgraced the IRS and broke public trust by accepting a gratuity from a taxpayer. But the facts of this particular case, coupled with the mitigating factors, do not warrant a sentence within or near the advisory guidelines. As noted in the Presentence Report and Recommendation, Paul's lack of arrest history, his financial struggles, and his current family situation are all mitigating circumstances.

### 3.  The need for the sentence to reflect the seriousness of the offense, promote respect for the law, deter future crimes, and protect the public

The recommended sentence of one-year and one-day imprisonment followed by one-year supervision is sufficient to reflect the seriousness of the offense, promote respect for the law,

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

deter future crimes and protect the public. First, this offense is serious in that it is a felony and Paul was a public official who dishonored his oath and ethical commitments to the public. But this case does not involve any allegations of violence, controlled substances or deadly weapons, and there remain mitigating circumstances to be considered. Moreover, Paul voluntarily resigned from the IRS three days after his arrest, acknowledging shame, "immeasurable regret, and unfathomable remorse." Paul will not be returning to the IRS, therefore, a lengthy prison term is unnecessary to deter future crimes or protect the public.  Of all the purposes of sentencings, the need to protect the public from further crimes of the defendant is one of the greatest practical concern and is the most capable of being measured.

The Sentencing Commission has released three studies on recidivism; MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES (May 2004) (hereinafter MEASURING RECIDIVISM),[1] RECIDIVISM AND THE FIRST OFFENDER (May 2004) (hereinafter FIRST OFFENDER),[2] and A COMPARISON OF THE FEDERAL SENTENCING GUIDELINES CRIMINAL HISTORY CATEGORY AND THE U.S. PAROLE COMMISSION SALIENT FACTOR SCORE (Jan. 4, 2005) (herein after SALIENT FACTOR SCORE).[3] These studies demonstrate that certain aspects of the Guidelines overstate the risk of recidivism. Moreover, the Commission's studies show that the following factors that are applicable to this case – which the Guidelines prohibit or discourage – correlate with reduced recidivism:

**a.**    **Age:** Age is a powerful component of recidivism predictions. SALIENT FACTOR SCORE at 8, 13-15. Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50. MEASURING RECIDIVISM at 12. Paul is 43.

**b.**    **Employment:** Stable employment in the year prior to arrest is associated with a lower risk of recidivism (19.6%) that those who are unemployed (32.4%). *Id.* at 12. Paul has worked full time at the IRS since 2009.

---

[1] *Available at* http://www.ussc.gov/piblicat/Recidivism_General.pdf
[2] *Available at* http://www.ussc.gov/piblicat/Recidivism_FirstOffender.pdf
[3] *Available at* http://www.ussc.gov/piblicat/Recidivism_SalientFactorCom.pdf

DEFENDANT'S SENTENCING
MEMORANDUM - 10

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

    **c.**    **Education:** Recidivism rates decrease with increasing educational level: no high school (31.4%), high school (19.3%), some college (18%), college degree (8.8%). *Id.* Paul has a college degree, a law degree, a masters of law degree (taxation) and certifications in accounting.

    **d.**    **Family:** Recidivism rates are lower for defendants who are married (13.8%) or were married but are divorced (19.5%) than if never married (32.3%). Paul has been in a long-term committed relationship with the same woman whom he met in college. He and his significant other have a two-year-old child together.

    **e.**    **Abstinence from Drug Use:** Recidivism rates are lower for those without illicit drug use in the year prior to the offense (17.4%) that those who used illicit drugs in the year prior to the offense (31%). *Id.* at 13. Paul has never used an illicit drug.

    **f.**    **Non-Violent Offenders:** Offenders sentenced under the fraud (16.9%), larceny (19.1%) and drug guidelines (21.2%) are the least likely to recidivate. MEASURING RECIDIVISM at 13. Paul is a non-violent offender.

    **g.**    **First Offenders:** First offenders are more likely to be involved in less dangerous offenses and their offenses involve fewer indicia of culpability, such as no use of violence or weapons, no bodily injury, a minor role or acceptance of responsibility. FIRST OFFENDER at 9-10. They are also more likely than offenders with criminal histories to have a high school education, to be employed, and to have dependents. *Id.* at 6-11. The rate of recidivism (including reconviction, rearrest or revocation) for first offenders in 11.7%, for offenders with one criminal history point is 22.6%, and for offenders with two or more criminal history points is 36.5%. *Id.* at 13-14. The rate of reconviction alone is similarly much lower: offenders with zero criminal history points ha a reconviction rate of 3.5%, those with one point have a reconviction rate of 5.5%, those with two or more points have a reconviction rate of 10.3%. *Id.* Paul is a first time offender.

## IV.    CONCLUSION

    The facts, circumstances and equities in this case warrant a sentence that is well below the advisory sentencing range. Paul humbly and respectfully asks this Honorable Court impose

DEFENDANT'S SENTENCING
MEMORANDUM - 11

a sentence of one year and one day of imprisonment, followed by one year supervision. Paul is an extremely intelligent man who made a desperate mistake that he must forever live with. However, Paul has tremendous upside and will make a seamless transition back into the community upon his release from prison. His conviction is an ugly blemish on an otherwise beautiful and law-abiding life. Given the reasons stated herein, the recommended sentence is certainly sufficient but not greater than necessary to achieve the goals and stated purposes of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted this 6th day of May, 2016.

_s/ Michael T. Lee_
MICHAEL T. LEE, WSBA 44192
JOHN HENRY BROWNE, WSBA, 4677
Attorneys for Paul G. Hurley
Email: michael@jhblawyer.com
johnhenry@jhblawyer.com

DEFENDANT'S SENTENCING
MEMORANDUM - 12

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
108 SOUTH WASHINGTON STREET, SUITE 200
SEATTLE, WASHINGTON 98104
PHONE: 206.388.0777 | FAX: 206.388.0780

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to attorney(s) of record for the Government.

*s/ Michael T. Lee*
MICHAEL T. LEE, WSBA 44192
Attorney for Paul G. Hurley
108 South Washington Street, Suite 200
Seattle, Washington 98104
Phone: 206.388.0777
Fax:  206.388.0780
Email: michael@jhblawyer.com

DEFENDANT'S SENTENCING
MEMORANDUM - 13